UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WILLIAM DINGLE,<br><br>Petitioner,<br><br>v.<br><br>WARDEN JOE LIZARRAGA,[1]<br><br>Respondent. | No. 2:15-cv-0845 MCE CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. Following a Siskiyou County jury trial, petitioner was found guilty of second degree murder. On March 26, 2010, petitioner was sentenced to serve 30 years-to-life in the California Department of Corrections and Rehabilitation. Petitioner presents eight claims concerning jury instructions. For the reasons set forth below, the court recommends that all claims be rejected.

I. Background

On direct appeal, the California Court of Appeal, Third Appellate District, summarized the facts presented at petitioner's trial and the proceedings relevant to petitioner's claims as follows:

---
[1] Warden Lizarraga is hereby substituted as the respondent in this action pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases.

1

By an amended information, the prosecution charged defendant with three offenses committed against the victim, Frank Martin, Jr., on February 1, 2008:

(1) first degree murder (§ 187),

(2) assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and

(3) assault with a firearm (§ 245, subd. (a)(2)).

Appended to the murder count were special allegations for personal and intentional discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)) and personal use of a firearm (§ 12022.5, subd. (a)(1)). It was also alleged that defendant had sustained a prior strike conviction (§ 667, subd. (e)) for a 1975 conviction for assault with intent to commit mayhem (§ 220).

Trial Evidence

Defendant and his then-girlfriend Darinda McElhaney (now his wife) lived in a mobile home in a rural area. Defendant's younger brother Malcolm lived approximately 35 yards away in a separate mobile home connected to defendant's home by a short trail. Malcolm's wife, Janet Dingle, lived with Malcolm. The victim was a friend of both defendant and Malcolm, but was closer to defendant.

When defendant and the victim drank alcohol they fought about who was "badder." On multiple occasions, defendant told the victim "Well, I'm going to kick your butt," to which the victim replied, "No you can't." Defendant was angry about a fight in December 2007, several weeks before the killing, in which the victim broke defendant's eardrum. The victim's sister, Patty Eldridge, testified that a few days before the killing, defendant told her that "the next time [the victim] tried to jump on him, [defendant] had a big surprise for him. He was going to get him [the victim]." The sister also told a detective that defendant said he was not going to let "that punk, Frank Martin, . . . kick [defendant's] ass in his own home again." However, a week or so before the killing, the victim referred to defendant as his "brother" in introducing defendant to the property manager where the victim lived.

On February 2, 2008, hunters discovered the victim's body in brush 5-10 feet off of a jeep trail in a remote high desert area of the county. The body had massive trauma to the face and gashes across the throat, the eyes were swollen shut, and one leg was severely deformed, indicative of a fracture. Defendant's DNA was on a crushed Miller Genuine Draft beer can found on top of the snow near the body.[2] The victim's wallet was found on his body. A

---

[2] The DNA results indicated a mixture of at least two donors. Defendant and the victim could not be excluded as donors. Approximately one person in 83 million could be included as possible

2

voicemail message from the victim's cell phone to his stepfather's phone, left on January 31 at 9:49 p.m., contained sounds of gagging and coughing and apparent footsteps.

An autopsy revealed blunt force trauma to the head and brain stem, incised wounds made by a knife or sharp-edged instrument to the head and neck, and bullet wounds caused by two bullets. There were no defensive wounds. The cause of death was "multiple forms of homicidal violence."

The pathologist testified that the blunt force trauma to the head caused multiple radiating fractures to the basilar skull. There was extensive bruising to the face, including two black eyes. The pathologist was unable to say how these injuries were inflicted; they could have been inflicted by an object, fists or foot stomping. However, there was more than one blow and the delivery of "a lot of force."

The two incised wounds to the neck measured eight inches and four inches in length. They were shallow and neither wound lacerated any major blood vessels or the airway.

The two gunshot wounds were both to the victim's back. There was no evidence of close-range firing. One bullet entered the back of the right shoulder and exited the pectoral muscle and then entered the left arm. This bullet missed the lungs and chest cavity.

The other bullet entered the lower back, traveled through the lower abdomen and diaphragm, grazing the liver and kidney, perforating the colon and small intestine, exiting the body, grazing the penis and reentering the left thigh, shattering the femur, and exiting the same leg. This bullet also did no damage to the chest cavity and lungs.

Based upon the location of the entry and exit wounds and the bullet paths, the pathologist opined the victim was on his left side, in the fetal position, when he was shot.

Two deformed bullets recovered during the autopsy had a unique rosy hue similar to Russian ammunition for a Czech/Russian 7.62-millimeter Tokarev gun and similar to an unexpended round found at the crime scene and another found near defendant's home.[3]

The victim had a blood-alcohol level of .19 percent.

The pathologist opined that the blunt force injuries to the head were severe and potentially lethal in and of themselves. He opined that the basilar skull fractures were "probably" a "lethal incapacitating injury at the outset." The neck lacerations were not lethal. The

---

contributors. Defendant's brother Malcom was excluded as a donor.

[3] Similar ammunition found inside defendant's home was not associated with the 7.62-millimeter gun.

3

bullet that entered the back of the victim's right shoulder was not lethal; it was survivable and would not have prevented "activity to get away." The bullet wound that entered in the victim's lower back was potentially lethal. Without medical treatment, the victim would have developed peritonitis and died from a bacterial infection of the abdominal cavity. Additionally, there was the potential for continued blood loss without medical attention. And the injury to the thigh caused by this bullet also had lethal potential, because of the potential for substantial blood loss. While the bullet that entered the back of the shoulder would not have been immediately incapacitating, the bullet that entered the lower back and ultimately entered the thigh and shattered the femur was incapacitating and would have prevented the victim from walking very far unless the victim could hop effectively. The leg was "out of play" after that wound was inflicted. The pathologist opined the gunshot wounds occurred at or near the time of death based on the fact that the bullets caused hemorrhage. However, there was not a great deal of bleeding in the abdominal cavity along the path of the bullet that entered the lower back and the victim may have been "on the way out" when the wounds associated with that bullet were inflicted.

On February 3, 2008, sheriff's investigators, having learned that defendant and the victim were close friends, contacted defendant to check on his well-being. Defendant drew suspicion to himself by denying that they were close. Contrary to the information provided by the victim's property manager, defendant denied describing his relationship with the victim as that of a brother and claimed he had not seen the victim for at least a month.

Later on February 3, a search warrant was executed at defendant's mobile home. During the search, an officer asked defendant if he knew the victim, and defendant again said he did not know the victim well and had not seen him for at least a month.

The search revealed that a small square of carpet and carpet pad had been cut from the floor in defendant's living room. Red stains on the exposed floor board were DNA tested and identified as the victim's blood. DNA tests of blood on a sock found in defendant's bedroom showed a mixed DNA profile consistent with reference profiles from defendant and the victim and inconsistent with Malcolm. The victim's blood was also found on a tarp and a clothesline located between the homes of defendant and Malcolm.

Cans of Miller Genuine Draft beer were found in defendant's refrigerator. A plastic bag in his kitchen contained numerous Miller Genuine Draft beer cans, crushed in a fashion similar to the Miller Genuine Draft can found near the victim's body.

Defendant's pickup truck was found near Malcolm's house. The truck had a flat tire. Nearby was a smoldering burn pile that contained what appeared to be a truck bed liner and some carpet. Stains on the tailgate liner that remained on the truck were DNA tested and identified as the victim's blood.

4

A search of Malcolm's house the following day revealed nothing of forensic value, though there were Miller Genuine Draft beer cans in the refrigerator. Malcolm said he had not seen the victim for about four weeks.

A detective testified that, in jailhouse phone conversations between defendant and Darinda or his son, defendant said he "didn't do it," and anyway it was self-defense, and the victim started it, and the victim's violence would help prove self-defense.[4] Defendant claimed Malcolm did it, and he was angry that he was being blamed while Malcolm was free.

At trial, Malcolm testified under a grant of use/derivative use immunity pursuant to section 1324. He testified that he owns a Czech gun but loaned it to defendant. The gun is a semiautomatic that resembles a .45-caliber handgun. The ammunition for the weapon is similar to .38-caliber ammunition.

On January 31, defendant and the victim had dinner at Malcolm's and Janet's home. Thereafter, the three men went to defendant's home. Malcolm watched television while defendant and the victim talked and then argued as the victim got drunk. The victim said "fuck you, Dave." Malcolm asked what was going on and the victim said, "He's trying to pick a fight with me." Malcolm got in front of defendant. Defendant hit the victim in the back of the head with an object, causing him to fall on top of Malcolm. Malcolm could hear the victim's head being struck with something. Malcolm rolled out from under the victim and ran outside for about half a minute. When Malcolm went back inside, he saw defendant straddled over the victim pointing a small .22-caliber Derringer pistol at him. Defendant fired the gun at the victim and said, "F this mother f'er [sic]." Malcolm went back outside. The bloodied victim ran away. Malcolm ran up to the victim and the victim said, "Look what he did to me, Malcolm." Malcolm told the victim they would get help. Malcolm went back to defendant and told him they had to help the victim. They drove defendant's pickup to Malcolm's house to put air in the tire. Janet asked what was going on. They said the victim was hurt and needed help. She left in her own vehicle to search for the victim while the brothers put air in defendant's tire.

Defendant and Malcolm came upon the victim first. Janet arrived, and the victim yelled toward Janet that he needed help. Malcolm sent Janet home, saying he and defendant would get the victim to a doctor. After Janet left, defendant worried aloud that the victim was going to "snitch." The victim said he would not snitch. The victim swung at defendant, and defendant knocked the victim to the ground. The victim pleaded for his life. Malcolm, who was walking around in shock on the other side of the truck, heard two gunshots. Malcolm saw the gun in defendant's hand. It was the gun Malcolm had loaned defendant. Defendant then kicked the victim

---

[4] The parties agreed to have the evidence come in through a detective's testimony rather than redact the tapes themselves.

5

"a couple of three times," pulled out a knife, and stabbed and sliced the victim's neck twice. Malcolm did not intervene, because he was afraid defendant would hurt him too.

At defendant's instruction, Malcolm helped put the victim's body in the truck. Defendant drove into the woods, saying, "Man, I lost my head." They left the body in some bushes. Malcolm said they should call the police. Defendant said he acted in self-defense, but the police would never believe him. At defendant's instruction, they set fire to the truck bed liner and their clothes.

Back at home, Malcolm told Janet that the victim "subdued to his injuries [sic]." He did not explain, and she did not ask any questions.

The jury learned that an unrelated firearm possession charge against Malcolm was dismissed when he pleaded guilty to being an accessory after the fact for helping defendant dispose of the victim's body. The district attorney's office made no promises to Malcolm about his sentence.

The jury watched videotapes of sheriff's detectives interviewing Malcolm on February 8, 14, and 15, 2008. Malcolm's trial testimony was mainly consistent with his February 15 interview. However, defense counsel cross-examined Malcolm about his prior inconsistent statements to sheriff's detectives on February 8 and 14. On February 8, Malcolm first told sheriff's detectives he was not present when the victim was killed but was at home watching television with his wife. They fell asleep and awoke when defendant knocked on the door, said he and the victim got into a fight, defendant acted in self-defense, and there had been an accident. Malcolm helped defendant dispose of the body. In his February 14 interview, Malcolm said Janet helped clean up the blood in defendant's home.

Janet testified at trial under a grant of use/derivative use immunity pursuant to section 1324. She, Malcolm, defendant, and the victim had dinner and drinks at her and Malcolm's home on January 31, 2008. After dinner, the three men went to defendant's home. Janet fell asleep and awoke to hear a voice saying defendant needed help. Janet went to defendant's home and saw blood all over the floor. Defendant told her not to call anyone, just help him clean up. She was scared because of the look in his eyes and the sound of his voice. When defendant left, Janet went home and saw Malcolm, who was frantic and wanted to find the victim to help him. She went looking but did not find the victim. On her way home, she saw Malcolm. He said they were going to get the victim some help and she should go home, which she did. Janet was hysterical because she thought something bad had happened. She went home, drank a glass of peppermint schnapps, and went to bed. Malcolm later returned and said the victim had "subdued to his injuries [sic]."

No defense witnesses were called. The defense argued that Malcolm murdered the victim, pointing to his history of violence,

6

> the use of Malcolm's gun, inconsistencies between statements by Malcolm and Janet, and defendant's consistent denials.
>
> The jury found defendant not guilty of first degree murder, but guilty of second degree murder. The jury found "not true" the enhancement allegations for personal use of a firearm and personal and intentional discharge of a firearm. The jury did not reach a verdict on count two, assault by means of force likely to produce great bodily injury (which the prosecutor declined to retry). The jury found defendant not guilty of count three, assault with a firearm.

ECF No. 25-1 at 3-10.

The Court of Appeal affirmed judgment, id. at 48, and the California Supreme Court denied petitioner's request for review of that decision. Resp't's Lodged Docs. No. 16 & 17.

II. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

/////

7

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). The California Court of Appeal's decision on direct appeal (ECF No. 25-1) is the last reasoned state court decision with respect to petitioner's claims.

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Petitioner's Claims

   A. Request for Modified Instruction

California Penal Code § 1111 concerns the testimony of an "accomplice:"

> A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

8

> An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

In his first claim, petitioner asserts that jurors were not adequately instructed with respect to this provision of California law as it pertained to the testimony of petitioner's brother Malcom. Jurors were provided the standard CALCRIM No. 334 instructions (CT 913-14) which petitioner claims were not adequate because jurors were not specifically informed "accomplice corroboration must connect the defendant with the commission of the crime in such a way as may satisfy the jury that the accomplice is telling the truth." Petitioner derived this language from California case law. See ECF No. 25-1 at 29.

In its decision concerning this claim, the California Court of Appeal found that the instructions given were adequate to describe applicable California law, ECF No. 25-1 at 29-32. Since it is not the "province of a federal habeas court to reexamine state-court determinations on state law questions," Estelle, 502 U.S. at 68, and because petitioner's claim does not reasonably suggest deprivation of any federal right, federal habeas relief is not available with respect to petitioner's first claim.

B. Accomplice Instruction as to Janet Dingle

In claim 2, petitioner asserts the trial court erred in failing to, *sua sponte*, identify Janet Dingle as a possible accomplice for purposes of California Penal Code § 1111 and then instruct the jury accordingly. The Court of Appeal found that Ms. Dingle was not an accomplice for purposes of § 1111:

> The evidence shows, at most, that Janet helped remove blood evidence from defendant's home and did not ensure that the victim was taken to a doctor. That evidence makes Janet an accessory after the fact to whatever crime occurred in defendant's house, but it is insufficient to make Janet an accomplice to murder. To be an accomplice, "the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33)." (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.) An accessory after the fact is not liable to prosecution for the identical offense of which the defendant is charged and therefore is not an accomplice. (*People v. Horton* (1995) 11 Cal.4th 1068, 1114.)

/////

Whether Janet Dingle was a possible accomplice, as that term appears in California Penal Code § 1111 is, by itself, a matter of California law. Even if the determination that Janet Dingle was not an accomplice indirectly implies a Constitutional issue, the determination by the California Court of Appeal that she was not an accomplice is not "based on an unreasonable determination of the facts." Accordingly, relief with respect to any such issue would be precluded by 28 U.S.C. § 2254(d)(2).

### C. CALCRIM 373

At trial, jurors were instructed as follows:

> The evidence shows that another person may have been involved in the commission of the crimes charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether that other person has been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crimes charged.

CT 919. Even though it was petitioner's trial counsel who requested this instruction, petitioner now argues giving it was error because the instruction denied jurors the opportunity to consider potential motives to testify falsely held by Janet and / or Malcom Dingle. The Supreme Court has specifically held that "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination." Davis v. Alaska, 415 U.S. 308, 316-17 (1974).

Janet and Malcom Dingle had two clear motivations to provide false testimony if their testimonies were false: 1) to endear themselves to prosecutors hoping it might result in favorable treatment; and 2) diminish their own culpability in the killing of Frank Martin, Jr. Nothing in the instruction identified above tells jurors these motivations could not be considered. The instruction is a simply a directive for jurors not to concern themselves with the reasons why Janet and Malcom Dingle were not also standing trial, as that is within the province of the prosecution and not admissible to show defendant's guilt. In other words, the instruction is simply an attempt to stop jurors from concluding defendant is the guilty one because he is the one the district attorney chose to prosecute. See People v. Brown, 31 Cal.4th 518, 560-61 (Cal. 2003) ("The purpose of [CALCRIM 373] is to discourage the jury from irrelevant speculation about the

prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators.") Based on the foregoing, it is clear petitioner's Constitutional rights were not violated when jurors were given the CALCRIM 373 instruction.

### D. "Slight Evidence" Of Corroboration

At trial, jurors were instructed as follows in accord with CALCRIM 334:

> Before you may consider the statement or testimony of Malcolm Dingle as evidence against the defendant, you must decide whether Malcolm Dingle was an accomplice. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if he or she personally committed the crime or if:
>
> 1. He or she knew of the criminal purpose of the person who committed the crime; AND
>
> 2. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime.
>
> The burden is on the defendant to prove that it is more likely than not that Malcolm Dingle was an accomplice. . .
>
> If you decide that a declarant or witness was an accomplice, then you may not convict the defendant . . . based on his or her statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if:
>
> 1. The accomplice's statement or testimony is supported by other evidence that you believe;
>
> 2. That supporting evidence is independent of the accomplice's statement or testimony;
>
> AND
>
> 3. That supporting evidence tends to connect the defendant to the commission of the crimes.
>
> Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crimes, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice.

11

> Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence. . .

CT 913-14.

Petitioner argues that the portion of this instruction which permitted jurors to find accomplice corroboration upon a showing of "slight" evidence lowered the burden of proof for the prosecution. Petitioner asserts "[b]ecause a corroboration requirement is part of the 'quantum of evidence' necessary to convict, the fact of corroboration must be proven beyond a reasonable doubt."

The California Court of Appeal analyzed petitioner's claim in detail and rejected it. ECF No. 25-1 at 20-26. Most notably, the Court wrote that "corroboration is neither an element nor a fact that must be proved." Id. at 25. The jury's ultimate charge that a defendant cannot be found guilty of a crime unless all elements are proved beyond a reasonable doubt (CT 897) is not undermined by the instruction jurors received regarding the limited evidentiary value of accomplice testimony. For these reasons, petitioner's fourth claim should be rejected. Further, relief as to this claim is precluded by 28 U.S.C. § 2254(d) because the California Court of Appeal's rejection of this claim: 1) is not contrary to, nor involves an unreasonable application of clearly established federal law; and 2) is not based upon an unreasonable determination of the facts.

E. <u>Burden of Proving Existence of Accomplice</u>

In claim five, petitioner again takes issue with the manner in which jurors were instructed consistent with CALCRIM 334 in the following respects:

1. "Because a corroboration requirement is part of the quantum of evidence necessary to convict, it was federal constitutional error to instruct that the defendant has the burden to prove that a witness is an accomplice;" and

2. "The instruction erroneously requires proof that the accomplice was actually guilty of the crime rather than 'probable cause' to believe the accomplice is guilty."

12

As for the first argument, the corroboration requirement is not part of the quantum of evidence necessary to convict; it is simply a limitation upon the evidentiary value of accomplice testimony.

The California Court of Appeal addressed the second argument as follows:

> Defendant argues CALCRIM No. 334 correctly states an accomplice is someone who is "subject to prosecution" for the same crime, but the instruction goes astray by effectively requiring defendant to prove the person's actual guilt as an accomplice, rather than merely showing probable cause. Defendant notes section 1111 . . . uses the phrase "liable to prosecution," rather than the instruction's language "subject to prosecution." Defendant says a person is liable to prosecution for an offense if it has been committed and "probable cause" exists to believe he did it. He cites case law addressing contentions that trial courts erred by failing to instruct juries that witnesses were accomplices "as a matter of law." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 759 (Rodriguez); *People v. Dailey* (1960) 179 Cal.App.2d 482, 485, citing *People v. Cowan* (1940) 38 Cal.App.2d 231, 242.) Defendant says a proper instruction would require only that he show "probable cause" to believe the witness is guilty of the offense. "Probable cause" signifies a level of proof below preponderance of evidence. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1188 [probable cause means a state of facts that would lead a person of ordinary prudence to entertain a strong suspicion of guilt].)
>
> In holding that probable cause was not enough to warrant an instruction that a witness was an accomplice as a matter of law, our high court said in *Rodriguez,* "the phrase 'liable to prosecution' in section 1111 means, in effect, properly liable. Any issues of fact determinative of the witness's factual guilt of the offense must be submitted to the jury. Only when such facts are clear and undisputed may the court determine that the witness is or is not an accomplice as a matter of law. [Citations.] The decisions stating that '[o]ne is "liable to prosecution" for an offense if it has been committed and there is "probable cause" to believe he has committed it' [citations] are not inconsistent with these principles. In *Dailey* accomplice status was established by uncontradicted facts [citation], while in *Cowan* the uncontradicted evidence showed that the witness was not an accomplice [citation]. The accomplice rule is intended to alleviate distortion stemming from consciousness of guilt, not from fear of unjust prosecution. Self-exculpatory testimony is certainly false if the witness is in fact guilty, but much less likely untruthful if the witness is innocent though falsely accused. And testimony by one not actually guilty is less prone to be " 'tainted . . . [or] given in the hope or expectation of leniency or immunity." ' " (*Rodriguez, supra,* 42 Cal.3d at p. 759.)
>
> Defendant cites *Rodriguez's* language that probable cause liability is "not inconsistent." According to defendant, that language means that probable cause is the correct formulation for jury determination

13

of accomplice status. We disagree. Cases are not authority for propositions not therein decided. (*People v. Barragan* (2004) 32 Cal.4th 236, 243.)

We conclude that the burden stated in CALCRIM No. 334 is appropriate.

As indicated above, this court defers to the California Courts as to questions of state law such as the issues raised in petitioner's second argument. Since there is no arguable basis for federal habeas relief present in petitioner's fifth claim, the claim should be rejected.

F. Motive Instruction

At trial, jurors were instructed pursuant to CALCRIM 370 as follows:

> The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive.
>
> Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty.

CT 918. Petitioner argues this instruction removed the requirement that he be proved guilty beyond doubt based upon the facts that were presented to the jury.

Again, jurors were specifically informed "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." CT 897. This overarching premise was in no way undermined by the specific instruction concerning motive. No violations of federal law are identified in petitioner's sixth claim.

G. Failure to Instruct on Voluntary Manslaughter

Petitioner asserts the trial court erred in failing to, *sua sponte*, provide jurors with the option of finding petitioner guilty of voluntary manslaughter based upon sudden quarrel or heat of passion. The Supreme Court has never found that a state court's failure to instruct as to a lesser included offense in a non-capital case provides a basis for federal habeas relief, and the court declined to reach the question in <u>Beck v. Alabama</u>, 447 U.S. 625, 638 n. 14 (1980). This being the case, petitioner cannot show the rejection of his claim in state court is either contrary to, or

14

involves an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Therefore, he is precluded from relief by 28 U.S.C. § 2254(d).

### H. Cumulative Effect

In his final claim, petitioner asserts the multiple Constitutional errors identified in his petition amount to a basis for federal habeas relief. As indicated above, however, this court finds no Constitutional error. Additionally, the California Court of Appeal rejected this claim, in part, because it found no Constitutional errors. That decision is not contrary to, nor does it involve an unreasonable application of clearly established federal law. Further, the decision is not based upon an unreasonable determination of the facts. Accordingly, relief is precluded under 28 U.S.C. § 2254(d).

## IV. Conclusion

For all of the foregoing reasons, the court recommends that petitioner's petition for a writ of habeas corpus be denied, and this case be closed.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's petition for a writ of habeas corpus (ECF No. 14) be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the

/////

specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 6, 2018

/s/ Carolyn K. Delaney
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
ding0845.157